IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SYLESTER WILLIAMS,** | Case No. 1:10-cv-00131 AWI JLT (PC) |
| **Plaintiff,** | **FINDINGS AND RECOMMENDATIONS GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **BOBBY PHILIPS,** | **(Doc. 80)** |
| Defendant. | **FINDINGS AND RECOMMENDATIONS DENYING PLANTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| | **(Docs. 78, 85, 99)** |

Plaintiff is a state prisoner proceeding pro se and in forma pauperis with a civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Defendant was deliberately indifferent to his health and safety in violation of the Eighth Amendment by permitting flies to enter his cell. (Doc. 11.) Having reviewed the arguments and evidence of both parties, it is recommended that Defendants' motion for summary judgment (Doc. 80) be **GRANTED** and Plaintiff's motion for summary judgment (Docs. 78. 85, 99) be **DENIED**.

**I. FACTUAL BACKGROUND**

At the time of the events which give rise to this litigation, Plaintiff was housed at Corcoran State Prison. (Doc. 11 at 2) At this same time, Philips was a pest control technician employed by the CDCR. (Doc. 80-3 at 1) He has held this position for many years. Id. Philips underwent

1  training to be qualified for his position. Id.

2  During the relevant period, Philips sprayed for pests at the prison on a regular basis, usually
3  monthly. (Doc. 80-3 at 1) Philips sprayed insecticide along the baseboards within the housing
4  units and other locations throughout the buildings, near garbage dumpsters and in other areas
5  which attract insects. Id. at 1-2. Philips reports that spraying is effective against crawling insects
6  but less so against flying insects. Id. at 2. For the insecticide to be effective, the pest has to make
7  contact with the spray for a sufficient time to kill it. Id. Flying insects don't usually remain in
8  the spray for a long enough time to kill them. Id. Philips asserts that the only way to effectively
9  kill flying insects is one at a time by swatting them, or by vacating the entire building and
10 "fogging" it. Id. at 2-3. However, Philips attests that this is a temporary solution only and once
11 the building is reopened, new flying insects will return. Id. at 2.

12 In addition to applying insecticides and seeking out insect harborages, Philips was responsible
13 for placing other eradication devices throughout the facility. (Doc. 80-3 at 2-3) Philips placed fly
14 sticks—which are sticks covered in a sticky substance that attracts and then captures flying
15 insects—in each of the buildings. Id. However, fly sticks were used by the CDCR mostly in the
16 spring, when outside temperatures start to warm and flying insects become more prevalent. Id.
17 Corcoran also has "fly fans" installed over many of the doors. Id. at 3. These fans produce a
18 burst of air whenever the door is opened to prevent flying insects from entering the space. Id.
19 Fly fans were installed at CSP-Corcoran over the doors to the kitchens where inmate food is
20 prepared but not in the housing areas. Id. Though the fly fans are effective, they are expensive
21 and Philips had no authority to order their installation. Id.

22 CSP-Corcoran is situated in an agricultural area with many farm animals in the area including
23 a large dairy farm which is immediately adjacent. (Doc. 80-3 at 3-4) Moreover, there are
24 wastewater treatment ponds which are nearby. Id. Flies are attracted to manure and feces such
25 that the area surrounding CSP-Corcoran attracts and breeds flies. Id. Despite this, Philips reports
26 that flies are a problem at CSP-Corcoran only during the warm months because cool nighttime
27 temperatures kill off the fly population. Id. at 4.

28 Philips attests that whenever he received a complaint about pests—through a prison official

preparing a work order—he would investigate each complaint and deal with the problem discovered as appropriate. (Doc. 80-3 at 4-5) He asserts that he learned about Plaintiff's complaint on November 3, 2009. Id. On that date, Philips spoke to Williams who reported that he was killing at least 10 flies per day in his cell. Id. at 4-5. Plaintiff complained that sometimes, there were as many as 25 flies in his cell over the course of a day. (Doc. 87 at 3) By this time, Philips had not received a work order related to the problem and he had received no other complaints about a fly problem in Plaintiff's housing area.[1] (Doc. 80-3 at 4-5) Philips told Plaintiff about all of the efforts he made to control the fly population but that the dairy farm located so close, made it difficult to fully eradicate them. Id. at 5; Doc. 78 at 2. Philips reported to Williams that no matter what he did, some flies would enter the building. Id. Thus, he encouraged Plaintiff to continue to swat flies he encountered and advised him that, with the approach of cooler temperatures, the fly problem would disappear. Id. Plaintiff told Philips he was concerned about flies landing on his food and, though Philips had no involvement in food distribution, he told Plaintiff that, from what he observed, food and utensils were kept covered so that this would not occur. Id. He also described to Plaintiff the fly fans placed over the doors to the kitchens to prevent flies from entering the food preparation areas. Id. This information was also told to Plaintiff on October 27, 2009, by the Supervisor Correctional Cook, S. Fuentes, in response to an earlier appeal related to his concerns that flies not come in contact with his food. (Doc. 78 at 24) Indeed, Fuentes reported also that fly strips were in place. Id. In addition, a different Supervising Correctional Cook wrote to Plaintiff that he was "not sure why there are so many flies; I know this is a problem for ever [sic] person here." Id. at 27. In another grievance, in December 2009, Plaintiff requested the reviewing officer admit that "Flies do try to eat food." (Doc. 78 at 30) The officer admitted this is true but assured Plaintiff that correctional staff

---

[1] However, by October 14, 2009, correctional officer Hayward granted Plaintiff's October 4, 2009 grievance that there were "to [sic] many flies in this building." (Doc. 78 at 32) Moreover, on November 2, 2009, Plaintiff requested an interview due to his complaints over flies. Id. at 35. The next day, the responding correctional officer replied that "Flies are a nuisance inside and outside prison walls. I cannot stop them from hanging out in 4AIR. I have logged and forwarded all of your appeals regarding this issue." Id. Thus, it appears that Plaintiff's complaints were not forwarded to Philips despite that they were forwarded to someone.

covered dinner trays to keep the food "in a sanitary state."[2] Id.

Despite the presence of 10 to 25 flies per day in Plaintiff's cell, Philips asserts that there were no practical measures—other than swatting—that would address the problem. (Doc.80-3 at 5; Doc. 78 at 2) He argues that, because the flies were coming from outside the building, fogging the inside of the building would kill only those inside and flies would continue to enter the space once the people re-entered the space. Indeed, in the months leading up to November 2009 and the month after, Philips inspected the facility for pests, and unsanitary conditions and performed vector control and exclusion activities and applied insecticide as needed and found no evidence of a flying insect infestation. (Doc. 80-4 at 5-13; Doc. 80-3 at 12)

## II. SUMMARY JUDGMENT STANDARDS

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (internal quotation marks omitted). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc.,

---

[2] In response to another grievance in December 2009, this same officer admitted that he confirmed that there were "small winged insects in the shower stall" and affirmed that he had never seen "vector control" in the shower areas. (Doc. 78 at 31)

477 U.S. 242, 248 (1986); Wool v. Tandem Computers, Inc., 818 F.2d 1422, 1436 (9th Cir. 1987). The party seeking summary judgment demonstrates it is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 quoting Fed. R. Civ. P. 56(c).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact. Fed R. Civ. P. 56(e); Matsuhita, 475 U.S. at 586. An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 587. The party is required to tender evidence specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. Id. at 586 n.11; Fed. R. Civ. P. 56(c). In addition, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322.

Despite minor disagreement over non-material facts[3], here, the material facts are undisputed.[4] Thus, the question presented to the Court is a matter of law.

### III. DISCUSSION

#### A. Eighth Amendment - Conditions of Confinement

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045

---

[3] For example, Plaintiff asserts that if insecticide is sprayed on the fly while in flight, the fly will die. This does not dispute that the insecticide must be applied to the fly itself to be effective. Moreover, this is consistent with Philips' claim that only "fogging" the building would kill the flies in the building but the burden—because it would require the entire building to be vacated and remain empty for hours—was not justified.

[4] Though Plaintiff disputes nearly every of Philips' undisputed facts, he supports the dispute by argument. Nevertheless, after reading every pleading filed by Plaintiff, it is clear that there is no real dispute of material fact.

(9th Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)). Prison officials therefore have a constitutional "duty to ensure that prisoners are provided with adequate shelter, food, clothing, sanitation, medical care, and personal safety." Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (citations omitted).

To establish a violation of this duty, a prisoner must satisfy both an objective and subjective component. Id. (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). First, "The Eighth Amendment is not a basis for broad prison reform. It requires neither that prisons be comfortable nor that they provide every amenity that one might find desirable." Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982). Thus, a prisoner must demonstrate an objectively serious deprivation, one that amounts to a denial of "the minimal civilized measures of life's necessities." Keenan v. Hall, 83 F.3d 1083, 1089 (9th Cir. 1996) (quoting Rhodes v. Chapman, 452 U.S. 337, 346 (1981)). In determining whether a deprivation is sufficiently serious, "the circumstances, nature, and duration" of the deprivation must be considered. Johnson, 217 F.3d at 731. These conditions must constitute "extreme deprivations" in order to violate the Constitution. Hudson v. McMillian, 503 U.S. 1, 9-10 (1992). Second, a prisoner must also demonstrate that prison officials acted with a sufficiently culpable state of mind, one of "deliberate indifference." Wilson, 501 U.S. at 303; Johnson, 217 F.3d at 733. A prison official is liable for denying an inmate humane conditions of confinement only if "the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

Plaintiff alleges that flies pervade the prison and often contaminate [5] prison food. However, analysis of the applicable authorities indicate that the situation described by Plaintiff—where he is having 10 to 25 flies in his cell per day—does not demonstrate a constitutional deprivation.

In Rhodes v. Chapman, 452 U.S. 337, 348-49 (1981), the Court considered when

---

[5] After reviewing Plaintiff's documents, it appears that Plaintiff means that when a fly lands on food, the food is contaminated.

conditions of confinement rise to the level of a deprivation of Eighth Amendment. The Court held that to find such a deprivation, the conditions must "inflict[] unnecessary or wanton pain or is grossly disproportionate to the severity of crimes warranting imprisonment." The Court cautioned against courts finding violations based upon "an aspiration toward an ideal environment for long-term confinement. But the Constitution does not mandate comfortable prisons, and prisons of SOCF's type, which house persons convicted of serious crimes, cannot be free of discomfort." Id.

In Warren v. Stempson, 800 F.Supp.991, 992 (D.D.C. 1992), the court considered whether a prisoner suffered cruel and unusual punishment by his placement in a cell block that was "plagued with rats, mice, roaches, spiders, flying bugs and insects, birds, lice and the shower water is most times cold." In rejecting that these conditions violated the Constitution, the Court observed,

> In Rhodes v. Chapman, the Supreme Court established the judicial framework for determining when prison conditions rise to the level of cruel and unusual punishment under the eighth amendment. See Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). In so doing, the Court cautioned that "[i]n assessing claims that conditions of confinement are cruel and unusual, courts must bear in mind that their inquiries 'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.' " Id. 452 U.S. at 351, 101 S.Ct. at 2401 (quoting Bell v. Wolfish, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979)). For the purposes of this motion, the Court assumes the conditions as described by plaintiff exist. While the Court does not condone such conditions and believes that, if they exist, they are substandard, the Court does not believe they rise to the level of cruel and unusual punishment. See Inmates of Occoquan v. Barry, 844 F.2d 828, 837 (D.C.Cir.1988) ("It is cruel conditions, defined by reference to community norms, to which the Constitution speaks; neither 'deficient' conditions nor conditions that violate 'professional standards' rise to the lofty heights of constitutional significance.").

Id. at 993.

Similarly, in Govan v. Campbell, 289 F.Supp.2d 289, 296 (N.D.N.Y. 2003), the plaintiff claimed that "shower stalls were unclean and had rust bubbles," and that "the tier was infested with cockroaches which could have crawled into his orifices while he slept, or inside his clothing and shoes. He further claims that the sink and hot water in his cell did not work. Govan also claims that 'wild birds' were permitted to fly freely through the facility. Finally, Govan contends that his safety was in danger since the officer on duty could not see directly into his cell at all

1  times." Despite these conditions, the Court dismissed the claim and held, "conditions that are
2  restrictive and harsh are an element of the penalty that criminal offenders pay to society for their
3  offenses. Govan asserts conditions which 'could have' caused him harm but he fails to assert how
4  he was actually harmed. It may well be that the shower stalls had rust bubbles, that wild birds
5  were permitted to fly within the cells, and that there were cockroach problems, but these
6  conditions do not rise to the level of a constitutional violation. Id., at 296-297.

7  On the other hand, Hoptowit v. Spellman, 753 F.2d 779, 783 (9th Cir. 1985), was a later
8  appeal in the earlier case Hoptowit v. Ray, 682 F.2d 1237, 1245 (9th Cir. 1982). In Ray, the trial
9  certified a class of plaintiffs based upon the cruel and unusual conditions in a Washington state
10 prison. The class challenged overcrowded conditions, "inadequate medical care, increasing
11 violence, the continuation of a lockdown, insufficient and poorly trained guards, improper
12 classification of inmates, torturous conditions in the isolation, segregation, and protective custody
13 units, inadequate physical plant, and inadequate vocational, educational, and recreational
14 opportunities." Id. In particular, the trial court considered the totality of the conditions
15 encountered in the physical plant and found inadequate the measures taken to control the threat of
16 disease communication caused by overcrowding, the lighting levels, the food service techniques,
17 the plumbing and ventilation systems, the fire prevention measures and the maintenance and cell
18 cleaning programs and found unacceptable the fact that the prison suffered from vermin
19 infestation. Id. Notably, though the court considered pests, i.e. vermin, it did not consider the
20 issue of insect infestation. Id. Thus, the trial court determined that the physical plant "'falls
21 below minimum standards of decency and conditions of confinement and violates Plaintiffs'
22 Eighth Amendment rights.'" Id. at 1256. Nevertheless, the Ninth Circuit reversed this
23 determination and remanded the matter for the trial court to consider whether each condition
24 standing alone, violated the Constitution. Id.

25 After this, the matter returned to the trial court which determined that each of the
26 conditions of the physical plant, including lighting, plumbing, fire safety, ventilation and air flow,
27 safety, vermin control and cell cleaning, standing alone, were so inadequate as to constitute a
28 constitutional violation. Spellman, 753 F.2d at 783-784. The matter was again appealed. As to

the vermin infestation, the Court of Appeals held,

> The district court found vermin infestation throughout the prison. It concluded that such a condition is inconsistent with the adequate sanitation required by the Eighth Amendment. We agree. The health hazard caused by vermin at the penitentiary is exacerbated by the plumbing and ventilation inadequacies. Such vermin infestation, properly considered in the light of unsanitary conditions such as standing water, flooded toilets and sinks, and dank air, is an unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.

Id. at 783. Once again, the Court of Appeals did not address to what extent insects must be present before the condition rises to a constitutional violation. The Court here concludes that to implicate the Eighth Amendment, a Plaintiff must demonstrate that an infestation has occurred— meaning there must be a showing that the area is inhabited or overrun in quantities of insects large enough to be harmful, threatening, or obnoxious.

Here, the Court does not find that 10 to 25 flies spread over the course of a day, constitutes an infestation.[6] This is especially true given Plaintiff's description of the fly problem as one where he would have three, four or five flies in the cell at a time, three, four or five times a day. (Doc. 87 at 3)  Even having five flies in the cell every couple of hours, is an irritant and an annoyance; it is not an "infestation" such to implicate the Constitution.

In any event, it appears that Plaintiff contends that the very presence of flies in the buildings, no matter Philips' ability to eradicate them and no matter the transient nature of flies, is sufficient to impose liability on Philips. He seems to impute to Philips knowledge of Plaintiff's earlier and later grievances related to the flies. Philips reports that before November 3, 2009, he had not received any complaints about flies in Plaintiff's housing area and had not been provided a work order to investigate the situation. (Doc. 80-3 at 4-5)  Plaintiff filed copies of his complaints including the correctional officer's response to Plaintiff's request for an interview in which the officer states, "I have logged and forwarded all of your appeals regarding this issue." (Doc. 78 at 35)  However, there is no evidence to whom the officer forwarded the complaints and, as noted above, Philips denies he received them.

---

[6] There is no showing that these were 25 *different* flies or the same handful of flies flying in and out of Plaintiff's cell.  Notably, Plaintiff reports, somewhat inconsistently, that he stopped killing flies and starting shooing them out of his cell. (Doc. 99 at 11)

On the other hand, even if Philips had notice that Plaintiff had been complaining of the flies for more than a month, the evidence demonstrates that there was little that Philips could do to address their presence. The surrounding land use encouraged the fly population and Philips could not control what occurred on neighboring lands. Despite this, Plaintiff seems to contend that Philips *could* have controlled the fly population. For example, Plaintiff relies upon the fact that the State of California killed off "fruit flies"[7] via aerial spraying as evidence that Philips *could have* killed off the flies if he wanted. (Doc. 99 at 1) The suggestion that Philips was required to go to this length or something similar—such as standing by with a can of Raid to spray any fly that interjected itself into Plaintiff's cell--to avoid liability, is plainly ludicrous. Plaintiff is not living at the Ritz; he is in prison and the burden of swatting 10 or even 25 flies per day is not cruel and unusual punishment. Rhodes v. Chapman, 452 U.S. 337, 348-49

Notably, this is <u>constitutional</u> litigation, not a negligence action and there is no evidence that Philips acted with deliberate indifference. The fact that he responded that—according to his training and experience--the best way to deal with flying insects in the numbers alleged by Plaintiff is to swat them, does not demonstrate deliberate indifference. Instead, it recommends a common household solution employed by millions. Likewise, the fact that Philips informed Plaintiff that the change in the weather would reduce the fly population similarly is not evidence of deliberate indifference but is a truthful comment as to the ability of the housefly to thrive in cold weather. To the contrary, the evidence demonstrates that Philips made efforts every month to inspect for insects, to spray for them as needed and to use other methods, such as fly strips, to attempt to combat the problem.

On the other hand, Plaintiff has failed to demonstrate that any harm, in fact, resulted from the presence of the flies. Though he asserts that he believes that Hepatitis can be contracted from contact with flies, he does not provide any evidence that anyone at CSP-Corcoran has contracted the disease as a result of exposure to the flies or that his risk of contracting Hepatitis is any greater than anyone in the general population. In addition to the annoyance of swatting or shooing

---

[7] Presumably, Plaintiff refers to the Mediterranean Fruit Fly.

the flies, the only evidence that Plaintiff suffered harm was that, on occasion when a fly landed on his food, he refused to eat it. Plaintiff does not set forth the number of meals he missed because of a fly landing on his food so the Court cannot conclude that it happened enough times to place Plaintiff's health in danger or to implicate the Constitution.[8] (Doc. 11 at 2) Thus, the Court recommends that Defendant's motion for summary judgment be **GRANTED** and Plaintiff's motion for summary judgment be **DENIED**.

### B. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 236 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The qualified immunity standard allows for mistakes in judgment by protecting all but the plainly incompetent or those who knowingly violate the law. Hunter v. Bryant, 502 U.S. 224, 229, citing Malley v. Briggs, 475 U.S. 335 (1986).

The defendant bears the burden of establishing qualified immunity. Crawford–El v. Britton, 523 U.S. 574, 586–87 (1998). In Saucier v. Katz, 533 U.S. 194, 121 (2001), the Supreme Court outlined a two-step approach for courts to analyzing whether qualified immunity should be afforded. The first step requires the court to ask whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. The second inquires whether the right was clearly established, in other words, "whether it would be clear to a reasonable officer that his conduct was unlawful in

---

[8] "The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir.1993). "The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation." Id. See also George v. King, 837 F.2d 705, 707 (5th Cir.1988) ("[A] single incident of unintended food poisoning, whether suffered by one or many prisoners at an institution, does not constitute a violation of the constitutional rights of the affected prisoners."); Islam v. Jackson, 782 F.Supp. 1111, 1114–15 (E.D.Va.1992) (serving one meal contaminated with maggots and meals under unsanitary conditions for thirteen days was not cruel and unusual punishment, even though inmate suffered symptoms of food poisoning on one occasion); Bennett v. Misner, 2004 U.S. Dist. LEXIS 19568* at 63, 2004 WL 2091473 (D.Or., Sept. 17, 2004) ("Neither isolated instances of food poisoning, temporary lapses in sanitary food service, nor service of meals contaminated with maggots are sufficiently serious to constitute an Eighth Amendment violation.")

the situation he confronted"? Id. Courts may grant qualified immunity on the basis of the "clearly established" prong without deciding whether any right had been violated. Pearson, at 236; accord Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2080 (2011).

As noted above, the Court concludes that there has not been a constitutional deprivation. In any event, as to the second prong of the analysis, the Court finds that a reasonable officer in Philips' position would not have known that the presence of 10 to 25 flies in a prisoner's cell over the course of a day violates the Constitution.  Thus, the Court finds that this was not a clearly established right at the time of the events giving rise to this litigation.  Therefore, the Court recommends that Philips motion asserting qualified immunity be **GRANTED**.

## IV. RECOMMENDATION

Based on the foregoing, the Court recommends,

1. That defendant Phillips' motion for summary judgment be **GRANTED**;

2. That Plaintiff's motion for summary judgment be **DENIED**;

These Findings and Recommendations are submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 14 days after being served with a copy, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."   Replies to the objections shall be filed within fourteen days after service of the objections. The District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  Failure to file objections within the specified time may waive the right to appeal the District Judge's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **August 24, 2012**              /s/ Jennifer L. Thurston
                                 UNITED STATES MAGISTRATE JUDGE